May it please the Court, I am Francis Lloyd of the Knox County, Tennessee Bar in the Eastern District of Tennessee. I appear for the defendant appellant, Mr. Joshua Roberts. I respectfully request to reserve five minutes for rebuttal. Thank you, Your Honor. Mr. Roberts was charged in an alleged conspiracy to possess with intent to distribute cocaine base. The indictment charged that the conduct or conspiracy occurred on or about June 24, 2011. By the time of co-defendants, save for one against whom the charges had been dismissed, had entered into plea agreements, and Mr. Roberts proceeded to trial before a jury on his own. Part of the government's case against Mr. Roberts consisted of the testimony of one co-defendant who had entered into a plea of guilty. Her name was Marquisha Jones. The jury, after hearing the government's case, as well as testimony of the defendant, convicted the defendant of the refer to three reasons why I submit on behalf of my client that he did not receive a fair trial. Towards the end of the trial, while he was under cross-examination, counsel for the government asked him whether he was affiliated with or a member of a gang. As his trial counsel, I objected after the question had been answered, admittedly. The justification offered by the government for My argument then, and my argument today, is that in a case in which there is only one defendant on trial, the proffered justification does not allow for the introduction of such unduly prejudicial and irrelevant evidence. Now, don't you think the jury would have quickly dismissed that reference, considering that this was not a gang crime and that the judge instructed the jury not to consider that question? Well, Judge Clay, I have to admit, as the record shows, that the judge did instruct the jury when it returned to disregard the question and answer. And I'm certainly up against that body of law that presumes jurors follow their instructions. My argument here is that this, in combination with some other portions of trial and argument that I'm about to get to, combined under the Francis decision cited in my brief, deprived this man of a fair trial. Had it been one error, even though prejudicial, and asked for a purely inflammatory reason, I would probably have to concede that the trial judge's, Judge Greer's, instruction was curative. But other things happened along with this, which I suggest created a pattern that I argue deprived Mr. Wright to a fair trial. The other two items are, first, in closing argument, and if I might leave the podium a minute to... counsel for the government vouched for the government's witness, the convicted co-defendant Marquisha Jones. It was argued to the jury that Ms. Jones took an oath, and of course that's true of every witness, whether a party or not. And it was argued also that she was not a convicted felon, whereas in fact she was. She had entered a plea in the same case, as a result of which she had been convicted of a felony. Also, in the same argument, counsel for the government argued what was in effect a physical evidence argument that Mr. Roberts must have been lying because he testified about the use of alcoholic beverages, and the evidence from law enforcement did not show that any alcoholic beverages were recovered at the site of the investigation that led to this prosecution. To explain why that, in my opinion, justifies the reversal that I'm here to argue for, I have to back up and remind the court that in the investigation of this case, it turned out that most of the same people who had a law enforcement encounter at a Motel 6 in Johnson City had been the day before at another motel in Johnson City, the Red Roof Inn, and there was evidence admitted that distribution of cocaine base was going on out of that first motel on the earlier date. Is this your constructive change argument? No, Your Honor, this relates to that. Mr. Roberts testified to going with mostly this same group on both occasions to Johnson City from Knoxville. On the earlier occasion at the Red Roof Inn, he testified to being in a motel room with a girlfriend, Jamaica Woods, also a convicted co-defendant by reason of a plea of guilty, and that Jamaica would occasionally leave the room and go and obtain alcohol from one of the others there in the group at the Red Roof Inn. There was no testimony that anything similar occurred when the group reconvened at the Motel 6 on the later date, the next day. Yet what was argued was, essentially, Mr. Roberts must be lying because you can see from the police evidence that there were no alcoholic beverages found at the Motel 6, the second place of the convening of this group. With respect, that, I submit, is simply a clearly erroneous finding by the District Court below in considering the post-verdict motions. There was no physical evidence of alcoholic beverages at the Motel 6, as opposed to the Red Roof Inn, simply because there was never in the record, never offered any evidence that there was drinking at the second place, the Motel 6, where the police encounter occurred. But as the record stood, he drew a fair inference from the facts that there were no alcohol served in the Motel 6, because as you just said, there was nothing brought out about it. But, Your Honor, my point is that the government's argument to the jury was that there was alcohol used at both locations and Mr. Roberts must have been lying on the stand because the investigative, the recordings of the investigation at the second hotel showed no evidence of alcohol. Well, there was none to show, and that was a false impeachment. You know, there's probably not only could you get cautionary instructions, but you get a general instruction, don't you, that closing arguments are not evidence? Yes, Your Honor, and I do concede that instruction was given here. Again, in reliance on the Francis case, when statements rise to the level of, or become repeated, inaccurate statements, or inflammatory, I believe reversible error does occur. I see I've used my time. I thank the Court. Thank you. May it please the Court, my name is Gregory Bowman, I represent the United States of America. Your Honors, the defendant, as he has indicated, was one of multiple defendants indicted for a crack cocaine distribution conspiracy, charging them with the distribution of 28 grams or more of crack cocaine. This all began when officers approached a motel room in which the defendant and three others were staying because of complaints from the motel about this overwhelming smell of marijuana smoke emanating from the room. The officers went to do a knock and talk. One of the co-defendants who, of course, pled guilty, Dwayne Turner, cracks the door to look out, apparently expecting a customer, and when he sees the officers, he attempts to slam the door in their face. The officers see the defendant running towards the back of the room. He was later found, because the officers went ahead and pushed their way in, he was found standing next to a bed at the back of the room. We're probably not really debating whether he's guilty or not, we're really debating whether your conduct, or your brother's conduct, was proper or not. Yes, Your Honor, and I wanted to set the scene, and in moving to the defendant's argument about whether these supposed misstatements combined together justify a mistrial, I would note that the defendant filed a motion for a new trial following the trial in this case, following his conviction. The defendant asked for either a new trial or that the case be set aside, and he raised each of the arguments that's raised before this court. Judge Greer, in a memorandum opinion, addressed each and every one of these same arguments that's before the court, and found that they were without merit. The first of those issues, of course, the defendant raised was this issue about the gang question. And what the defendant was actually asked is, isn't it true, sir, that you are a member of the Gangster Disciples? The defendant said, no, sir. There was no objection to that question or that answer. Given his negative response, the next question was one of impeachment of that first answer. You know, there's a lot of law, and Younger lectured on this, that you could ask any question you wanted, but you were stuck with the answer. You know, you could say, isn't it true you were having an affair with your wife, and he could say yes or no. If you said no, you couldn't bring the wife in. Well, and I would concede that. That is the end of it, when you ask that question. And my real question is, what's wrong with the prosecutor's offices that come in here? You act like you must nail everything down, and you've got all the advantages in the world. I mean, he's got, you know, criminals. You've got FBI agents and that, and you can't resist it? I mean, it's to the point that I just feel like reversing you guys all the time. And maybe it would drive in your head that you don't have to do these things. I mean, it was over with. You've got your answer? No. Well, and I appreciate that, Your Honor. And, in fact, of course we are required to be an advocate, to be a zealous advocate. By the same token, there was proof that I did not seek to admit in this case. Certainly unlike the Ford case that's cited on this issue by the defendant, there was nothing brought in during the government's case in chief. And notably in the Ford case, even though there was significant evidence brought in about gang membership, that case was affirmed. The simple fact is, Your Honor, Judge Greer decided after the objection was made late that he would not admit this testimony, this negative answer or the question, and asked the jury to disregard it. And we must assume that the jury would follow Judge Greer's decision. To what point we can make that assumption? Yes, sir. And the argument the defendant makes... The counsel says this isn't the point. It says it's too far gone to make that assumption. Well, but, Your Honor, Judge Greer, who of course was there, had the ability to see the demeanor, to view the jury, to witness what was going on, indicated that he did not see how it could be prejudicial. In fact, I would submit that Judge Greer even suggested that it might not be advantageous to the defense to even give a cautionary instruction, given that it might bring extra light upon it. Nevertheless, the cautionary instruction was requested and it was given. Now, the defendant asked that the court look at this combined with these alleged misstatements during closing argument. But when Judge Greer looked at these alleged misstatements during closing argument, Judge Greer found there were no misstatements by the United States in closing argument. There were fair inferences that were made. The one thing that I would note, the statement made as to Markeisha Jones, the convicted co-conspirator, this was her first felony conviction, and the statement was that she's not a convicted felon. Well, if the court would look at the record, what it reflects is in closing argument, I had talked at great length about her conviction in this case. Follow that up with, unlike the defendant, she's not a convicted felon. The obvious import of that is she was not a convicted felon until she became convicted in this case. I don't see that there's any other way the jury, given the totality of the argument, could have taken that. And of course, arguments by counsel are not even evidence. Nevertheless, Judge Greer went ahead to consider these two statements made in closing argument and said even if they were improper, he went on to decide the factors that this court set forth in U.S. v. Carroll and U.S. v. Tarwater. He considered all of those elements and he said that the statements did not tend to mislead the jury or prejudice the defendant, that they were isolated, they were accidentally made, and the evidence against the defendant was strong. So he went ahead and he considered even if the statements were improper, I'm going to address the Sixth Circuit elements, and he decided even if they were improper, it did not justify setting aside the verdict in the case. Now, moving on to this issue of constructive amendment. The real issue when it comes down to constructive amendment is whether there's a Fifth Amendment violation, whether there's any substantial likelihood that the defendant has been convicted of a conspiracy other than that with which he was charged. He was charged with a conspiracy that occurred on or about June 24, 2011, the date that officers went and did the knock and talk and found nearly 100 grams of crack cocaine. Later on, Markeisha Jones enters a guilty plea. Markeisha Jones comes forward, talks to officers. They learn about the two days prior and how this group had decided to come to Johnson City, which is about two hours' drive from Knoxville, Tennessee, and sell crack cocaine because the price of crack cocaine in Johnson City was higher. And so the defendant was provided with discovery because the government obtained the records of this Red Roof Inn where Markeisha Jones said they stayed the night prior to the Motel 6 where they were ultimately found at the time of the knock and talk. And the defendant, of course, had the plea agreement of Markeisha Jones and it was filed almost two months prior to trial. And that's important because if you look at the factual basis of Markeisha Jones, it sets forth in great detail the whole theory of the government's case. That factual basis sets out what came in at trial. Additionally, there was an 801 D2E notice filed before trial which gave notice of co-conspirator statements on or about June 22, two days prior to June 24, that is charged as on or about in the indictment. Judge Greer considered all of this. He found that the earlier conduct clearly related to the indictment charged in the indictment and, of course, admitted it. And that's consistent with the case law of this court. We've cited various cases including US v. Manning where conduct which was months prior to that charge in the indictment was found to be inappropriate. The defendant also objects to various evidentiary rulings of Judge Greer. And, of course, Judge Greer considered all of these evidentiary issues not only at trial but also on the defendant's motion for a new trial. The first being a statement made by co-defendant Jamaica Woods who entered a guilty plea that the defendants were merely in Johnson City to go shopping to which Officer Garrison replies, Well, that's funny. We people in Johnson City, we go to Knoxville to go shopping. And if anybody is familiar with the area, Knoxville is much larger and has much more shopping malls. No juror would be surprised by that. And this was particularly problematic because the objection was made by the defendant just prior to the trial starting. Judge Greer said this should have been part of a motion in limine. In fact, there had been a motion to suppress which was actually a motion in limine filed by the defendant to keep this videotape. It was an officer's uniform cam video and it had audio on it as well.  And the government responded that it did not intend to bring in this whole long video and we edited out the portion that we intended to show at trial. The magistrate judge reviewed that, found that it was appropriate. The district judge affirmed that. But this issue about the statement made in that redacted video which the defendant had well in advance of trial was never raised until we got to the trial. And Judge Greer found that it was not timely and indeed the defendant has shown no basis for bringing that up so late. The judge found that it was also appropriate 801 D2E testimony and permitted it. Now the defendant asserts that the court should have done a 403 analysis of this statement but the defendant never asked the court to do a 403 analysis. And there's no obligation upon the district court to do that analysis. Moving on to the evidentiary question about key cards. There were some key cards to the motel room in the defendant's pocket. They were inadvertently pulled out of his pocket when an officer pulled out his wallet. The judge made findings about that, said that they were inadvertently pulled out of the defendant's pocket. And interestingly enough... What were those cards used to show? Well, the cards were used to show that the defendant was exercising some control over these two rooms where the crack cocaine was found. Was that shown to the court? I'm sorry? Was that shown in court? The key cards? No, sir. The key cards, the officer... And there's actually disputed testimony about this. The officer testified that when he pulled the wallet out and the key cards fell on the ground, he picks them up. It was immediately apparent to him, well, those are key cards to this motel. And he turned them back over to hotel management because the lease on the room was up. Now, the defendant testified that in actuality the officer handed him the key cards back. I'm trying to ask what the key cards were used for. I mean, typically those cards don't have a room number on them. Well, they didn't have a room number on them. So if you're in there, it makes sense you have a key to the room. So I'm not sure what they were used for to show his guilt. Well, the defendant submitted that he actually was staying in room 109. They were found in room 231. On cross-examination, the defendant admitted that he actually had key cards to both of these rooms. And he was the only person that had keys. Those cards don't prove that. No, not the keys themselves. It was the testimony that showed that. I'm still asking. It's just a simple little factual question. What were the key cards used for? If they were guns or if they said room 302, that would say something. But these are just cards which may or may not say anything. They picked up a postcard. Sure, and the key cards themselves did not reflect anything on their face. Why do we care whether they were admitted or not? Well, because the defendant brings it up and takes great issue with it, Your Honor. But basically they were shown that he was the only defendant that had these key cards, yet he's trying to distance himself from this group, distance himself from this room. And the defendant also asserts that the United States could not question him about his asserted knowledge of crack cocaine, even though he testified on direct examination from his own attorney that he knew what crack cocaine looked like. And so Judge Greer appropriately permitted the United States some limited questioning about how he knew what crack cocaine looked like. Did they have to ask him whether he sold it or not? I was troubled by that. Did I have to ask him whether he sold it or not? Well, Your Honor, I think it was a fair question about how he knew that. . . I mean, it just seems like inherently prejudicial. And if you say, have you ever seen it sold, is one thing. But to say, have you ever sold it. . . Well, I think those questions would have similar import because I think a jury would ask. . . Yeah, but one would be more prejudicial than the other. So if they have similar import and one's highly prejudicial, why not ask the other one? Well, Your Honor, there was no request to do any 403 analysis with regard to this. The question was asked. In fact, there was no further objection made to this particular question. Not objected to, is your argument? It was not objected to, Your Honor, and that's correct. And so it would be reviewed for plain error as far as that question not being objected to. Counsel, you might want to wrap up. Your red light's been on. Oh, I'm sorry. I didn't notice the time, Your Honors. But I would ask that this case be affirmed, and I thank you for your time. Thank you. Counsel, could I ask about that one question at the very end where your opposing counsel said, did you buy crack or whatever? Did you sell crack? He did ask that question, right? Yes, he did, Your Honor. Was it objected to? No, Your Honor. I believe I had objected. I'm sorry. My memory's a little bit murky on this. But the issue of the admissibility, the judge had already ruled, and not with my agreement or acquiescence, that because I asked him first, did you see any cocaine base in this room at the Motel 6, I then asked him, do you know what it looks like? Fair enough question. Yes, Your Honor. And, of course, even the code distinguishes between cocaine base and powder or soft cocaine in the street bar. He said, yes, I know what it looks like. Yes, Your Honor. And the other side cross-examines him. Yes, Your Honor. I guess you would think he would cross-examine him to show that he didn't know what it looked like so that that would undermine his testimony that he knew whether it was there or not. But, in fact, he's trying to get him to say, I did know what it looked like, so he could look like a criminal. But I'd already asked the question whether he was familiar with it, and the judge had. So you might say, well, you're thinking now, of course, this requires you to think very quickly. It does. But you might think, well, he's asking, he's following up on, did you know what it looked like? I can't object to that because I asked, did you know what it looked like? But then he says, did you sell it before? That would seem like it would raise an immediate red flag with you. I should have objected, Your Honor. But does the fact that you objected mean that it's not reversible? No, Your Honor. Because the court should have jumped in and said. Well, the court had already ruled that I had opened the door, but the court. Yeah, but how wide did you open the door is what I'm asking. And the trial court below was not specific about how wide I had opened it. So I didn't think I had opened it that wide until the question came. And as I have said in my brief with respect to another issue, if this conviction is affirmed because of my failure to make a timely objection, I hope that the court will let my client know of his potential 2255 remedies. Well, you can advise him of that. And I have, Your Honor. I have just a few remaining points. I want to make sure that the court understands what my brother across the aisle was referring to in the line of questioning. I don't want the court left with the impression that I sat mute while the questioning concerning gang affiliation was asked. I'm looking at page ID number 835, which is part of the transcript of this trial. And in particular, beginning at line 16, it shows that my brother, Mr. Bowman, put a photograph up without publishing it to the jury and said, Who is that handsome young fellow right there? It was a photograph of my client. My client answered, That's me. The question, That's you, okay. You, sir, are a member of the Gangster Disciples. Isn't that correct? Answer, No, sir. And to this point, I had not activated my legs quickly enough. But the very next question was, Well, sir, you've got a tattoo on your neck of a six-pointed star. And at that point, I did stand and object to relevance. With respect to the constructive amendment issue, all I have to say is that it is significant in that there was eyewitness testimony pertaining to the first day at the Red Roof Inn of my client cutting cocaine and no such testimony concerning what took place on the date charged in the indictment at the Motel 6. The court asked about the use of the room cards, and they were basically, while not admitted into evidence, they were used to impeach my client on the basis of this minor disagreement between the law enforcement officer and my client over whether the officer had returned the keys to my client or, as my client testified, or had returned them to management. I see that my time is up. And I do ask on the basis of my arguments today, as well as the arguments presented in my briefs, that this court reverse the judgment of the court below. Thank you. Case is submitted. May call the next case.